AMERICAN ARBITRATION ASSOCIATION
Case No. 01-20-0000-2568


| Kenneth Nathanial McNeil, | |
| Claimant, | |
| v. | **CLAIMANT'S REBUTTAL BRIEF** |
| Anderson Financial Services, LLC, LoanMax, | |
| Respondent. | |

NOW COMES Claimant, through his counsel, and respectfully submits this Rebuttal Brief in support of his claims.

Respondent's entire defense is premised on a claim that all contractual activities took place in Virginia. Respondent's own documents show that this claim is false. This loan originated directly from Respondent's efforts to market in North Carolina by paying a referral fee through its network of existing North Carolina customers. This is not just Claimant's contention about what happened - this is confirmed by Respondent's own records which show that Claimant was referred by an existing customer, Claimant's

1

daughter. When Claimant was reached by those marketing efforts, he called Respondent from North Carolina. Respondent admits that this call occurred. Claimant and Respondent discussed a loan. Respondent told Claimant what to do, where to come and what to bring. Only then did anything happen in Virginia and only because Respondent told Claimant to come to Virginia. Because contractual activities occurred in North Carolina, the Act applies. Likewise, because contractual activities occurred in North Carolina, the transaction between Claimant and Respondent is not wholly extraterritorial and the Dormant Commerce Clause does not apply.

## I.     Contractual Activities Occurred In North Carolina.

N.C. Gen. Stat. § 53-190 is clear.     The North Carolina Consumer Finance Act applies to all consumer loans in the amount of less than $15,000 made to North Carolina residents unless ***all contractual activities occur entirely outside of North Carolina.***  To avoid the Act, Respondent proffers an overly narrow construction of the both the statute and the facts and seeks to apply the Dormant Commerce Clause to a transaction which is not wholly extraterritorial.  Indeed, contractual activities took place in North Carolina before they ever took place in Virginia.  Respondent's requirement that claimant, a North Carolina resident, travel to Virginia to sign documents

2

related to a loan for which a security interest will be perfected in North Carolina, is nothing more than an effort by Respondent to avoid the application of North Carolina interest laws.

In its brief, Respondent defines solicitation as a requiring "an active effort ... an affirmative attempt to contact a prospective borrower." Resp. Brief p. 13. This is precisely what Respondent did when it asked North Carolina customers to refer other North Carolina customers. Respondent told Claimant's daughter that it would pay her if she referred other customers. She then did so. Now Respondent feigns surprise when its active efforts to obtain more North Carolina resident borrowers subjects it to North Carolina law. Significantly, Respondent is subject to North Carolina law if it comes into North Carolina either directly or through its agents. N.C.G.S 53-190(b).

Second, Respondent admits that it had a discussion on the telephone with Claimant when Claimant called from North Carolina to ask about a loan. Respondent would apparently have the Arbitrator find that the legislature meant something more than two people talking to each other about a loan when it used the term "discussion" in a statute that regulates loans. There is no basis for such a narrow reading. There might be a dispute about what precisely was discussed during the call, but there is no dispute that the call occurred and that the topic of the conversation was a title loan.

3

The statute does not require that any specific contractual details be discussed or that any certain information be given or exchanged. Respondent does not appear to contest that its representative told Claimant what documents to bring and where to come.

Next, Respondent contends that its admitted perfection of its security interest in North Carolina is not a contractual activity. This narrow constructive too fails. Section 53-190(a) is not limited to only the activities immediately surrounding the execution of the loan document as Respondent contends. Indeed, a North Carolina Superior Court Judge recently suggested that the recording of a lien, standing alone, triggers North Carolina law. North Carolina Superior Court Judge Michael A. Stone, from the bench on December 11, 2020 and while rejecting a South Carolina car title lender's choice of law argument when a lien was recorded - like here - with the North Carolina DMV, stated:

> I think it's the crux of the whole issue. I mean, quite frankly, let's assume Automoney doesn't take calls from people out of state, doesn't solicit, they don't do anything, but given that their name is a lienholder on the North Carolina certificate of title, if that's all they do, it's game over in my opinion -- the way I see the law.

(*Smith v. AutoMoney, Inc.*, Hoke County Superior Court, December 11, 2020, Transcript at 50, attached). (Judge Stone's Order denying title lender Auto-Money's motion to dismiss for failure to state a claim upon which relief can be

4

granted was attached to Claimant's opening submission).

The North Carolina legislature purposefully passed a broad statute, with non-exclusive enumerated activities and catch-all phrasing, that captures any transaction where any activities, including pre-formation and post-formation activities, occur at least in part North Carolina. Respondent's suggestion that perfecting a contractual security interest in Claimant's motor vehicle is not a "contractual activity" under N.C. Gen. Stat. § 53-190(a) strains credulity. Indeed, obtaining that lien was a "but for" condition of Respondent's willingness to make a law. No lien = no loan.

Perhaps the best insight into the legislature's intent is to compare the current statute with the former version. Respondent's position actually used to be the law in North Carolina, but it is not any longer. (see 1961 version of NCGS 53-190, attached). Formerly, if a contract was lawfully formed in another jurisdiction it could be enforced in North Carolina. In other words, the reading that Respondent now proffers for the current version of N.C. Gen. Stat. 53-190 used to be the law in North Carolina. **Until the legislature changed the law in 1979.**

Make no mistake about it. Kenneth McNeil calling Respondent from North Carolina, discussing and obtaining information about a title loan, and

5

ultimately driving to Virginia to finalize a loan that violates North Carolina law is precisely what Respondent intended to happen with its North Carolina referral program and its telephone discussion with Mr. McNeil. These are also precisely the type of efforts to avoid the application of North Carolina law to consumer lenders who make predatory loans to North Carolinians that Section 53-190 is intended to curtail. Respondent has made thousands, if not tens of thousands, of car title loans to North Carolina residents. This begs the question: why doesn't Respondent set up a business location in North Carolina? The answer, of course, reveals Respondent's plan and intent to violate North Carolina law. If a trip by a North Carolina borrower just across the state line into Virginia is removed from the transaction, that would also remove Respondent's ruse that the entire transaction takes place in Virginia.

## II. The Dormant Commerce Clause Does Not Apply to This Transaction Because this Transaction is Not Wholly Extraterritorial.

For the same reasons the NC Consumer Finance Act applies -contractual activities occurred in North Carolina - Respondent's Dormant Commerce Clause argument also fails. A threshold requirement for the application of the Dormant Commerce Clause is that the activity sought to be regulated is "wholly extraterritorial." The "principle against extraterritoriality" is born of the notion that "a State may not regulate

6

commerce occurring <u>wholly</u> outside of its borders." *Healy v, Beer Inst.,* 491

U.S. 324, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)(emphasis added). The

commerce between Claimant and Respondent did not wholly occur outside of

North Carolina. Indeed, the interaction started within North Carolina's

borders when Respondent's customer told Claimant to call Respondent called

from North Carolina (as Respondent had incentivized her to do). Indeed, the

commerce occurred partially outside of North Carolina only because

Respondent required Claimant to travel to Virginia to complete the loan so

that Respondent could seek to avoid the application of North Carolina law.

After the loan documents were signed Respondent's commercial activities

returned to North Carolina where Respondent perfected its security interest.

To get around this problem, Respondent asks the Arbitrator to put blinders

on and narrowly construe "commerce" to include what only occurred when

Claimant was physically present at Respondent's location in Virginia and

ignore what came before and what came after. Such a narrow reading is not

supported by the language of N.C.G.S. §53-190 and is not required by the

Dormant Commerce Clause.

Contractual activity is broadly defined under N.C.G.S. §53-190 to in-

clude a number "all contractual activities," a number of which are enumerat-

ed in the statute. "Contractual activities" expressly include pre-formation ac-

7

tivities, including discussion and solicitation. Section 53-190 includes post-contractual activity in subsection (b) where the statute reads: "If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, *comes in to this State* to solicit or otherwise conduct activities in regard to such loan contracts then such lender shall be subject to the requirements of this Article." N.C.G.S. §53-190(b)(2015)(emphasis added).

Nor does the Commerce Clause require the narrow construction. Every North Carolina court that has considered a dormant Commerce Clause challenge to North Carolina's lending laws has rejected the challenge. The Business Court in *Western Sky* rejected a challenge that the North Carolina Usury Statute, N.C.G.S. §24-1.1, and the North Carolina Consumer Finance Act, N.C.G.S. §53-164, *et seq.*, violated the dormant Commerce Clause as those statutes were being applied to the conduct of the predatory lender that was the target of state enforcement action in that case. In rejecting that challenge the Business Court held that "[t]he statutes at issue do not attempt to regulate conduct beyond North Carolina's borders and do not unduly burden interstate commerce." The Court further observed that "[t]he statutes do not purport to dictate the interest rates or other lending practices that De-

8

fendants apply in any state other than North Carolina." The Court conclud-
ed, after engaging in a balancing analysis pursuant to *Brown-Foreman*, that
"the State's application of the relevant statutes to the loans at issue does not
violate the dormant Commerce Clause."

Subsequent to *Western Sky,* every North Carolina Superior Court Judge
who has heard and considered the motions of other car title lenders to dis-
miss on dormant Commerce Clause grounds (and for failure to state claims
based on choice of law) has denied those motions. *Western Sky* is attached
hereto. The numerous other state court orders were attached to Claimant's
spending submission.

Even Respondent's centerpiece authority - *Midwest Title Loans v. Mills* -
anticipated this outcome. The Court observed:

> Midwest has yet to sue any of its title borrowers. But if there
> were a suit, an Indiana court might rule that Indiana had the
> "most intimate contacts" with the transaction and therefore that
> its law applied even though the loan had been made in Illinois.
> Or it might rule that Illinois's failure to limit the interest rates in
> title loans was so offensive to the public policy of Indiana that the
> Illinois law would not be enforced in Indiana – in which event the
> Indiana courts might refuse to apply Illinois law even if Mid-
> west's contracts contained a choice of law clause directing that
> Illinois govern a suit arising from the contract – which they do. In
> short, a particular set of facts giving rise to litigation [can] justi-
> fy, constitutionally [that is, under the due process clause] the ap-
> plication of more than one jurisdiction's laws.

9

*Id.* at 668 (internal citations omitted) And, again, the North Carolina Business Court expressly addressed this issue in its post-*Midwest Title Loans* decision and rejected the argument that Respondent now makes. The North Carolina Business Court opinion is much more persuasive, because it: (a) addresses the factual and legal issues here: whether North Carolina law may permissibly apply to consumer loans with North Carolina residents when contractual activities take place in North Carolina; and (b) deals directly with the North Carolina consumer protection statutes at issue here rather than an Indiana registration requirement.

Further, even within the Seventh Circuit, where *Midwest Title* is binding precedent, subsequent courts have reached a different result where a foreign lender seeks to apply the Dormant Commerce Clause to a loan transaction with home state borrower. The court in *Deborah Jackson, et al. v. Payday Financial, et al*, 79 S. Supp. 3d 779 (N.D. Ill. 2015) rejected a defendant predatory lender's argument that "the Dormant Commerce Clause bars the application of Illinois law to [the defendant's] loans, which were consummated outside of Illinois." In reaching that conclusion, the court observed that "[d]efendants ignore the significant contacts that the [p]laintiffs maintained with Illinois that were not shared with the Indiana borrowers in *Midwest Title*," including

10

the facts that the borrowers had reached out from Illinois for loans and the lender had made loans offers to the borrowers at a time when the borrowers were in Illinois. *Id.* at 784. *Jackson* is squarely on point with the matter before the Arbitrator. Claimant was solicited by one of Respondent's customers through Respondent's compensated referral program. Claimant then called Respondent from North Carolina to obtain more information and to discuss a loan. The eventual finalization of the loan in Virginia cannot alter these facts.

Further, *Midwest Title* relied upon *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) in finding that a lender physically located in another state cannot be made to register in Indiana to conduct business with Indiana residents.

> In Quill Corp. v. North Dakota, 504 U.S. 298, 314–18, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), the Supreme Court held that a state whose residents purchased by mail from sellers who had no office in the state could not require the seller to collect the use tax that the state imposed on sales to its residents. That is an example of extraterritorial regulation held to violate the commerce clause even though the entity sought to be regulated received substantial benefits from the regulating state, just as Indiana's regulation of Illinois lenders furthers a local interest—the protection of gullible or necessitous borrowers.

*Midwest* at 666.

11

*Quill* and the physical presence rule have since been expressly overruled. *South Dakota v. Wayfair, Inc.*, 138 S.Ct. 2080, 2099 (2018). Respondent avoiding a physical presence in North Carolina does not protect Respondent from compliance with North Carolina law because Respondent has substantial connections to North Carolina with regard to its loans to North Carolina borrowers.

Lastly, Respondent makes a "parade of horribles" argument that Claimant's reading of the statute would lead to an inability of an out-of-state under to enforce judgments in North Carolina or would lead to borrowers from other states moving to North Carolina to avoid loan obligations. First, the Arbitrator should decide Claimant's case and not some fictitious case imagined by Respondent. Second, there is no evidence of any such exodus to North Carolina, presumably because many other states have similar laws relating to predatory consumer lending.[1]

---

[1] A number of states have enacted similar statutes that protect their residents from out-of-state predatory lenders. *See, e.g.,* Kan. Stat. Ann. §16a-1-201(1)(b), Me. Rev. Stat. Ann. tit.9-A, §1-201(B), Minn. Stat. Ann. §47.601, sub. 5, Ohio Rev. Code. Ann. §1321.17, Okla. Stat. Ann. tit. 14A §§1-201(5) & 1-201A, W.Va. Code §46A-1-104; Wyo. Stat Ann. §40-14-120(a)(ii), D.C. Code §28-3301(h).

As to Respondent's concern that Section 53-190 impairs its ability to enforce foreign judgments in North Carolina, this concern has already been addressed by the Uniform Enforcement of Foreign Judgments Act as adopted in North Carolina. N.C. Gen. Stat. § 1C-1708 provides that '[t]he provisions of this Article [The Uniform Enforcement of Foreign Judgments Act] shall not apply to foreign judgments based on claims which are contrary to the public policies of North Carolina." Even if the arbitrator finds that Section 53-190 is unconstitutional, Respondent would still be barred from enforcing a judgment in North Carolina pursuant to section 1C-1708 as "[i]t is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1(g).

## CONCLUSION

Contractual activities indisputably occurred in North Carolina. The North Carolina Consumer Finance Act applies. The dormant Commerce Clause does not. The clear provisions of North Carolina law must be applied. The loan is void.

For the reasons stated herein, Claimant respectfully asks the

13

Arbitrator to make the following Awards:

1. That the Arbitrator declare the loan void and unenforceable;

2. That Claimant have and recover reasonable attorneys' fees pursuant to N.C.G.S. §75-16.1; and

3. Alternately, that Claimant have and recover of Respondent the amount of $500 for Respondent's violation of 10VAC5-210-30, plus his reasonable attorney's fees.

Respectfully submitted, this 15th day of March, 2021.

/s/ James R. Faucher
James R. Faucher
Attorney for Claimant

FOR THE FIRM:

**BROWN, FAUCHER, PERALDO & BENSON, PLLC**
822 North Elm Street, Suite 200
Greensboro, NC 27401
(336) 478-6000 (telephone)
(336) 273-5597 (facsimile)
james@greensborolawcenter.com

14

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served a copy of the foregoing document in the above-entitled action upon all other parties to this cause by email addressed to the parties as follows:

Melanie Dubis
melaniedubis@parkerpoe.com

Respectfully submitted, this 15th day of March, 2021.

/s/ **James R. Faucher**
James R. Faucher
Attorney for Claimant

FOR THE FIRM:

**BROWN, FAUCHER, PERALDO & BENSON, PLLC**
822 North Elm Street, Suite 200
Greensboro, NC 27401
(336) 478-6000 (telephone)
(336) 273-5597 (facsimile)
james@greensborolawcenter.com

*1961 Version*

when appointed and qualified, shall have such powers and duties as to custody, collection administration, winding up, and liquidation of such property and business as shall from time to time be conferred upon him by the court. (1957, c. 1429, s. 6; 1961, c. 1053, s. 1.)

§ 53-188. Review of regulations, order or act of Commission or Commissioner.—The Commission shall have full authority to review any rule, regulation, order or act of the Commissioner done pursuant to or with respect to the provisions of this article and any person aggrieved by any such rule, regulation, order or act may appeal to the Commission for review upon giving notice in writing within twenty (20) days after such rule, regulation, order or act complained of is adopted, issued or done. The validity of any rule, regulation, order or act of the Commission shall be subject to judicial review as provided in article 33, chapter 143 of the General Statutes of North Carolina. (1957, c. 1429, s. 6; 1961, c. 1053, s. 1.)

§ 53-189. Insurance.—(a) Credit Life Insurance.—The amount of credit life insurance shall not exceed the original indebtedness, but this insurance may be carried on the loan to maturity at level term.

(b) Credit Accident and Health Insurance. — The amount of periodic indemnity payable with respect to any one installment payment period by credit accident and health insurance in the event of disability, as defined in the policy, shall not exceed the original amount of the loan divided by the number of periodic installment payment periods, and such insurance shall not extend over any longer period of time than the loan contract.

(c) Group Contracts for Insurance; Insurance to Be Required of Only One Obligor.—Notwithstanding any other provision of this article, a licensee may sell such insurance or provide the same under a group contract, subject to the applicable laws of the State relating to insurance. Any gain or advantage in the form of commission or otherwise, to the licensee or to any employee, affiliate, or associate of the licensee from such above described insurance or its sale shall not be deemed to be an additional or further charge in connection with the contract of loan. No insurance authorized by subsections (a) and (b) of this section shall be required with respect to more than one obligor of any one loan contract.

(d) When Credit, etc., Insurance Not to Be Required. — Notwithstanding any other provisions of this article, no licensee shall require any borrower to obtain credit accident and health insurance when a loan is secured by collateral consisting of personal property with respect to which property loss insurance has been required to be obtained.

(e) Licensee Not to Receive Commissions, etc., on Property Loss Insurance. —No licensee shall directly or indirectly receive any commission, premium or profit from the sale of any property loss insurance on any property used as collateral to secure any loan made pursuant to the provisions of this article.

(f) Sale to Comply with Chapter 58 of G. S.—Notwithstanding any other provisions of this section or article, nothing herein contained shall be construed to authorize the sale of insurance in violation of any of the provisions of chapter 58 of the General Statutes or the rules and regulations promulgated pursuant thereto. (1961, c. 1053, s. 1.)

§ 53-190. Loans made elsewhere.—No loan contract made outside this State in the amount or of the value of six hundred dollars ($600.00) or less for which a greater consideration, or charges than is authorized by § 53-173 of this article has been charged, contracted for, or received shall be enforced in this State and every person in anywise participating therein in this State shall be subject to the provisions of this article; provided, that the foregoing shall not apply to loans legally made in another state. (1961, c. 1053, s. 1.)

§ 53-191. Businesses exempted. — Nothing in this article shall be construed to apply to any person, firm or corporation engaged solely in the business

93

STATE OF NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

*****************************************************************

LAKISHA SMITH,
       Plaintiff,

          versus

AUTOMONEY INC.,

             Defendant.

COUNTY OF HOKE

20 CVS 295

*****************************************************************

MOTIONS TRANSCRIPT

December 11, 2020

*******************************************

Civil Session

Honorable Michael A. Stone, Judge Presiding

- - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

DREW BROWN,
Brown, Faucher, Peraldo & Benson, PPLC
822 N. Elm Street, Suite 200
Greensboro, NC 27401
On behalf of Plaintiff

JAMES FAUCHER,
Brown, Faucher, Peraldo & Benson, PPLC
822 N. Elm Street, Suite 200
Greensboro, NC 27401
On behalf of Plaintiff

Ililani O. Watts, CVR
Official Court Reporter
ililani.o.watts@nccourts.org

APPEARANCES CONTINUED:

MICHAEL MONTECALVO
Womble Bond Dickinson, LLP
One West Fourth Street
Winston-Salem, NC 27101
On behalf of Defendant

1    THE COURT:  Well I think it's pretty clear.  I
2  think both sides would concede that you've got arbitration
3  rewards that are inconsistent, you've got, really none --
4  guidance from the appellate courts -- clear guidance on this
5  issue.
6          Do both sides concede that?
7          MR. FAUCHER:  Yeah, there is not clear appellate
8  opinions on 53-190 ----
9          THE COURT:  And specifically that specific issue
10  because I think that issue is pretty important.  I think it's
11  the crux of the whole issue.  I mean, quite frankly, let's
12  assume Automoney doesn't take calls from people out of
13  state, doesn't solicit, they don't do anything, but given
14  that their name is a lienholder on the North Carolina
15  certificate of title, if that's all they do, it's game over
16  in my opinion -- the way I see the law.  And then looking at
17  the plain language of 53-190 -- I'm ready to make a ruling.
18          The Court has reviewed all of the materials,
19  believes that the counsel for both sides have done a
20  wonderful job, and the Court, in its discretion, is going to
21  deny the Defendants motions to dismiss under Rule 12 that
22  they filed.
23          Does the Plaintiff have a proposed order?
24          MR. FAUCHER:  I did not bring an order.  I didn't
25  know if you would want to make findings ----

Ililani O. Watts, CVR
Official Court Reporter
ililani.o.watts@nccourts.org