# AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-20-0003-7987

Michael Reeves          Claimant
-vs-
F&B Financial Services, LLC     Respondent

## AWARD OF ARBITRATOR

Claimant (Reeves) seeks compensatory, statutory, treble and punitive damages, along with interest and costs, including legal fees, from F&B Financial Services, LLC d/b/a American Auto Title Loan (F&B). The bases for Reeves's claims are in the Complaint he and other plaintiffs filed against F&B in North Carolina (Guilford County) Superior Court (the Court) as civil action no. 19-CVS-5900 (the Lawsuit). By its January 17, 2020 order (the Order[1]), the Court concluded that: (a) it had specific personal jurisdiction over F&B; and (b) the motion of Reeves and the other plaintiffs to compel arbitration should be granted. The Order also appointed the American Arbitration Association (AAA) to administer arbitration(s) between plaintiffs and F&B.

Reeves filed the Demand on March 23, 2020. The Demand names Concord, North Carolina as "the requested city and state for the hearing if an in-person hearing is held." On May 12, 2020, F&B filed its AAA Answering Statement and Counterclaims (Answer) "in response to [the] Complaint as if [it] had been asserted in this Arbitration." The Answer generally denies the allegations of the Complaint. The Counterclaims seek declaratory relief, an award of attorney's fees, and any other relief "the Arbitrator deems just and proper."

Reeves and F&B agreed at the August 18, 2020 Preliminary Hearing to, and the Scheduling Order (SO) then entered accordingly provides for, an award providing "concise written reasons for the [arbitral] decision." The evidentiary hearing (Hearing) proceeded by videoconference on October 19, 2020 and each party then made post-hearing submissions, all as provided in the SO.

In addition, Respondent requested leave following the Hearing to submit several AAA arbitration awards in other matters. Claimant did not object to the request. The Arbitrator in his discretion elected to receive and review this submission, and this Award reflects due consideration of these as well as all other information and advocacy of the Parties and their counsel.

---

[1] Both the Complaint and the Order are exhibits to Reeves's demand for arbitration (Demand).

13524327v2 26882.00016

Reeves seeks relief under N.C. Gen. Stat. § 53-164 *et seq.*, alternatively under N.C.G.S. § 24-2.1 *et seq.* and, in case liability under either of these statutes is determined, also under N.C. Gen. Stat. § 75-1.1 *et seq.* (the Unfair and Deceptive Trade Practices Act, or UDTPA). Reeves also seeks punitive damages. F&B seeks a declaration that its contract and activities as to Reeves were lawful, and awarding it relief under the UDTPA as the prevailing party in respect of Reeves's principal claims.

I, Edward F. Hennessey, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between Claimant represented by James Faucher of, Brown, Faucher, Peraldo & Benson, PLLC and Respondent represented by Scott Anderson of Womble Bond Dickinson US, LLP, and having been duly sworn, and having duly received and carefully reviewed and considered the Parties' evidentiary and other submissions, and having heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held on October 19, 2020, do hereby, AWARD, as follows:

1.      Reeves is awarded $3,000.00 as principal compensation from F&B. This amount: (a) represents the Arbitrator's determination, including on the basis of disputed evidence about the value of Reeves's automobile repossessed by F&B, of the amount to which Reeves is entitled from F&B under N.C. Gen. Stat. § 53-166; and (b) shall bear interest at the North Carolina statutory rate of 8% (N.C. Gen. Stat. § 24-1) from the date of filing of the Complaint until paid. Reeves's request that F&B return his automobile is denied. Title to the vehicle shall be, or remain, solely with F&B or its assignee or designee;

2.      Reeves's principal compensation is trebled under Chapter 75 of the North Carolina General Statutes. The trebled component ($6,000.00 of the total of $9,000.00 in total principal compensation) shall bear interest at the North Carolina statutory rate of 8% from the date of this Award until paid;

3.      Neither Party shall receive attorney's fees or other monetary relief from the other;

The administrative fees of the American Arbitration Association (AAA) totaling $4,700.00, and the compensation of the arbitrator totaling $2,500.00 shall be borne as incurred.

The above sums are to be paid on or before 30 days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration. All claims and requests for relief, of any kind, not expressly granted or denied elsewhere in this Award are denied.

| | |
|---|---|
| December 7, 2020 | Edward F. Hennessey, Arbitrator |
| Date | |

2

01-20-0003-7987

**Dominick Ramone Hinson**

**Claimant,**

v.

**TitleMax of Virginia, Inc. d/b/a TitleMax**

**Respondent.**

## <u>AWARD OF THE ARBITRATOR</u>

I, James H. Locus, Jr., THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, each represented by counsel, at an evidentiary hearing conducted by Zoom on November 18, 2020, do hereby make the following award:

A.   Background

This matter was brought pursuant to a title loan agreement entered into on July 1, 2016 between the Claimant and the Respondent.  The undisputed terms of the Loan Agreement required that Claimant remit eleven monthly payments of $172.82 beginning in August 2016 and one final payment of $172.88 on July 1, 2017.   The Agreement contained a clause in which the borrower and the lender agreed to waive trial by jury and proceed by arbitration.

Although the parties disputed certain factual issues, the following evidence is not contested.  Claimant, a citizen of North Carolina, became aware (through his mother) of Respondent, a Virginia business, that made short-term loans using the borrower's vehicle as security.  Claimant traveled to Respondent's facility in Martinsville, Virginia where he

negotiated and signed a loan agreement and received the agreed upon funds.

While the parties dispute the actual number of payments made, there is no dispute that one payment was in fact recorded by the Respondent. Claimant concedes that he did not make all payments required by the Loan Agreement. After Claimant defaulted on the loan, Respondent had the vehicle repossessed and sold by their agent. Both the sale and repossession took place in North Carolina.

B.    Issues

Claimant raises several issues. He contends that Respondent's practices violated the North Carolina Consumer Finance Act, N.C.G.S. Section 53-164 et seq. More specifically, he alleges a violation of N.C.G.S. Section 53-190(a), which provides in part that "(N)o loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less for which greater consideration or changes that are authorized by G.S. 53-173 ["computation of interest; application of payments; limitation on interest after judgment; limitation on interests after maturity of the loan"] or G.S. 53-176 ["Rates, maturities and amounts"] of this Article have been charged, contracted for, or received, shall be enforced in this State. Furthermore, N.C.G.S. Section 53-190(b) reads as follows:

> If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($ 15,000) or less, comes into this State to solicit *or otherwise conduct activities in regard to such loan contracts*, then such lender shall be subject to the requirements of this Article. (Emphasis added).

Claimant seeks compensatory damages under the Consumer Finance Act and further argues that such damages should be tripled pursuant to N.C.G.S. Section 75-1.1, the Unfair and

-2-

Deceptive Practices Act (UDPA). As part of his UDPA contention, Claimant also seeks reasonable attorney's fees pursuant to N.C.G.S. Section 75-16.1. In the alternative, Claimant seeks to recover for violation of North Carolina's usury statutes, N.C.G.S. Section 24-2.1, et seq.

Respondent raises several defenses. First Respondent argues that the loans were created entirely outside of North Carolina and that the laws of North Carolina do not apply. In the alternative, Respondent also argue that under the dormant commerce clause, a state may not regulate commerce occurring wholly outside its borders. Specifically, Respondent contents this statute violates the Commerce Clause of the United States Constitution because it would improperly promote and project the laws of one state (North Carolina) onto a valid contract (Loan Agreement) that was validly made, entered, and existing pursuant to the laws of another state (Virginia). Finally, Respondent challenge petitioner's proposed recovery, stating that actual damages and treble damage are not both recoverable.

C.  Discussion

*Constitutional Claims.*  Respondent argues that the statute violates the Commerce Clause of the United States Constitution. In general, an arbitrator should take a state law as it is written. However, in this instance, since this question appears to be dispositive on the remaining issues, it will be addressed to the extent it has been challenged by the Respondent.

At the outset, it is noted that there is longstanding precedence that State laws that regulate evenhandedly to effectuate legitimate local public interest will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. The Respondent has the legal burden to make a sufficient showing that the "burden imposed" is clearly excessive. I find that the Respondent has not met this burden.

It is well established that a law is discriminatory if it places an impediment upon "a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State."

-3-

"Discrimination" for purposes of the dormant Commerce Clause is "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *DirecTV, Inc. v. State of North Carolina*, 178 N.C. App. 659, 661-62, 632 S.E.2d 543, 546 (2006).

Commerce Clause claims are subject to a two-tiered analysis. The first tier, a virtually per se rule of invalidity, applies where a state law discriminates facially, in its practical effect, or in its purpose. The second tier applies if a statute regulates evenhandedly and only indirectly affects interstate commerce. In that case, the law is valid unless the burdens on commerce are clearly excessive in relation to the putative local benefits. *Waste Indus. USA, Inc. v. State,* 220 N.C. App. 163, 169, 725 S.E.2d 875, 881 (2012). "In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *North Carolina Ass'n of Elec. Tax Filers v. Graham,* 333 N.C. 555, 565-66, 429 S.E.2d 544, 550 (1993).

### i. Facial Discrimination

The statute is not facially discriminatory. A facial challenge to a legislative act is . . . the most difficult challenge to mount successfully. The Respondent must establish that no set of circumstances exists under which [the statute] would be valid. Moreover, the challenger must demonstrate there is an "explicit discriminatory design to the [statute]." *DirecTV, Inc.,* 178 N.C. App. at 663, 632 S.E.2d at 547.

Facially, Respondent has not produced sufficient evidence to show that this statute explicitly put a greater burden on Respondent solely because its business is generated from out-of-state. Furthermore, Respondent has failed to demonstrate an explicit discriminatory design in the statute. Based on the foregoing, it is concluded that Respondent has failed to produce sufficient evidence that the statute is facially discriminatory.

### ii. Discrimination in its Practical Effect

In order to successfully argue that the statute is discriminatory in its practical effect, the Respondent bears the initial burden of showing that this statute has a discriminatory effect on interstate commerce. *DirecTV, Inc.*, 178 N.C. App. at 665, 632 S.E.2d at 548.

-4-

Again, there was not sufficient evidence in the record to prove that the statute has impacted TitleMax's operations more heavily based on the fact that it is crossing state lines. Moreover, there is not sufficient evidence in the record to support Respondent's contention that this statute affected in-state and out-of-state businesses differently. Based on the aforementioned reasons, Respondent has failed to produce sufficient evidence that this statute is discriminatory in its practical effect in violation of the Commerce Clause.

D.    Findings

(1)   I find that Respondent has not come forward with sufficient evidence to support their contentions that the statute is unconstitutional and thus this argument is overruled. In addition, I find based on the evidence in the record, that the loan transactions between Claimant and Respondent met the requirements of N.C.G.S. Section 53-190(a) in that the relevant activities described in that section occurred outside of the state of North Carolina. However, I also find:

a.     That the perfection of the Claimant's lien with the North Carolina Department of Motor Vehicle of North Carolina occurred in North Carolina;

b.     That the repossession of the Claimant's vehicle by Respondent's agent in North Carolina;

c.     That the sale of Claimant's vehicle in North Carolina;

d.     That the issuance of post-agreement letters and texts including delinquency notices by Respondent to Claimant sent to the North Carolina address; and

e.     That Respondent accepted payments from North Carolina

constituted activities contemplated by or within the scope of the North Carolina Consumer Finance Act (North Carolina General Statutes, Section 53-164. et seq.). While it may be argued that Section 53-190(a) applies only to activities prior to and coincident with the formation of the contract, Section 53-190(b) cannot be read to be so limited when it refers to a lender coming into the State to "otherwise conduct activities in regard to such loan contracts."

(2)   I find that Respondent's repossession and sale of the Claimant's vehicle in accordance with the loan provisions did violate North Carolina General Statute 75-1.1.

-5-

(3)    Claimant alleged that he made four payments of $172.82, but there is evidence in the record of only one payment in that amount being made by the Claimant. Claimant presented evidence that the value of the vehicle was $6,400.00. Claimant has provided reasonable evidence that his actual damages was one payment of $172.82 and the fair market value of the vehicle at $6,400.00 which totaled $6,572.82.

(4)    Claimant also proposes that the damages be trebled under North Carolina's Unfair and Deceptive Trade Act (UDPA), and provided authority that violation of the CFA is a per se violation of the UDPA, entitling him to those treble damages. I agree with Claimant's argument on this point and make the adjustment in the final award to $19,718.46.

(5)    Claimant requests an award of reasonable attorney fees under the UDPA. That statute provides for recovery of attorney fees where there is a finding that "the party charged has willfully engaged in the act or practice and there was an unwarranted refusal by such party to fully resolve the matter." N.C. Gen. Stat §75–16.1 Although it is clear that Respondent has willfully engaged in the prohibited practices, I have not seen anything in the record regarding efforts to resolve this matter. Accordingly, and in my discretion, I decline to award recovery of attorney's fees.

E.    Conclusion

In conclusion, I order that Respondent pay Claimant the amount of $19,718.46 which is triple the amount of actual damages that he has proved. The foregoing sum shall be paid on or before thirty (30) days from the date of this Award. The administrative fees and expenses of the American Arbitration Association totaling $2,654.00 and the compensation for the Arbitrator totaling $2,500.00 shall be borne as incurred by the Parties. This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Date:    January 5, 2021

*James H. Locus, Jr*

JAMES H. LOCUS, JR.
AAA ARBITRATOR

-6-

# AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-19-0001-3828

Stanley Bernard Ewings

Claimant

-vs-

TitleMax of Virginia, Inc.

Respondent

## AWARD OF ARBITRATOR

### A.    Background

Claimant (Ewings) seeks compensatory, statutory, and treble damages, along with interest and costs, including legal fees, from TitleMax of Virginia, Inc. (TitleMax).   Ewings also seeks a declaration that his three loan agreements with TitleMax are unenforceable, to the extent any remains susceptible to enforcement.

Ewings along with other plaintiffs sued TitleMax and other defendants in North Carolina Superior Court.  The suit was removed to federal court in North Carolina, which compelled arbitration.

Ewings filed his Demand on May 3, 2019.  The Demand names Greensboro, North Carolina as "the requested city and state for the hearing if an in-person hearing is held."  On June 2, 2020, TitleMax filed its Response.[1]

At the August 31, 2020 Preliminary Hearing, TitleMax asked for a reasoned award.  Ewings had no objection, and the Scheduling Order (SO) of the same date specifies a reasoned award.  The

---

[1] Why more than a year elapsed between the Demand and Response is not clear from information provided to the Arbitrator.  The Response alleges TitleMax had not yet been served with the Demand, but filed its Response "in an abundance of caution."  The Response also alleges the AAA "reopened Claimant's previously-filed Demand ...," and implies this happened after and presumably in response to the order compelling arbitration.  Neither party argues that the gap between Demand and Response is significant to the outcome here, and the Arbitrator notes this apparent history largely as context for the year+ gap.

13535399v1 26882.00015

evidentiary hearing (Hearing) proceeded by videoconference on October 23, 2020. Each party made both pre- and post-Hearing submissions, all as provided in the SO and orders supplementing it.

## FINDINGS OF FACT

Based upon the documentary information; witness testimony, including any credibility determinations the Arbitrator found necessary to resolve; pleadings; and other submissions by the parties, the Arbitrator finds the facts on which his Conclusions of Law rest to be as follow below. Except where dates are stated, all facts are found as of all times relevant to the Conclusions of Law:

1.      Ewings lives in Greensboro, North Carolina. He owns a 2001 GMC Yukon SUV (the Vehicle). TitleMax makes loans to individual at, in market terms, high rates of interest and secured by the borrower's title to a motor vehicle (Title Loans). TitleMax has numerous offices in states other than North Carolina, including Virginia and South Carolina. Because North Carolina does not permit Title Loans on the terms TitleMax makes them, it has no office in North Carolina.

2.      On the strength of his title to the Vehicle, provided as security for each, TitleMax made Ewings three loans: (a) a $1,115.00 loan originated on November 11, 2015; (b) a $1,132.00 loan originated on December 6, 2016; and (c) a $920.00 loan originated on April 14, 2018 (each a Loan and together "the Loans"). TitleMax disbursed to Ewings the stated amount loan amount less $20.00. The $20.00 covered the fee TitleMax paid to the North Carolina Department of Motor Vehicles (DMV) to record and thus perfect a lien against Ewings's title to the Vehicle.

3.      Ewings paid TitleMax a total of $5,083.66 in respect of the Loans.

4.      Ewings learned about TitleMax through acquaintances. Before traveling to a TitleMax office in Danville, Virginia, as he did to close each of the Loans, Ewings placed a phone call to TitleMax while in Greensboro.[2] During that call, a TitleMax representative told Ewings that, based on his statements about the Vehicle, he appeared to be eligible for a TitleMax loan, and directed him to bring the Vehicle to a TitleMax office.

5.      As a general matter, based on evidence unrefuted by TitleMax, its representatives assured North Carolina callers they would receive a loan if they could produce, at a TitleMax location, both an operable vehicle and title to it. There is no evidence TitleMax refused a loan to any prospective borrower who met these conditions. If callers related they could meet these conditions, their TitleMax counterpart would direct them to travel to a TitleMax office to

---

[2] It is not clear whether, after the first loan, Ewings called ahead or just went to the TitleMax office to pursue the second and third of the Loans. The difference is immaterial: Ewings learned during the first call that he was, according to TitleMax, a candidate to receive a loan, and after the first loan he understood what was involved in obtaining another.

13535399v1 26882.00015

conclude the transaction. The loan amount TitleMax would specify depended on its evaluation, at its office, of the value of the vehicle to serve as security.

6. It was TitleMax' practice, when callers inquired about a loan, to determine the caller's state of residence in order to specify what documents TitleMax would need should the caller opt to visit one of its locations to pursue a car title loan. The representative with which Ewings spoke asked him his state of residence. Ewings said North Carolina, and the representative and told him what documents to bring to TitleMax.

7. TitleMax, as part of its marketing and sales efforts, routinely calls prior North Carolina residents who have borrowed from it before, or whose contact information it has otherwise obtained, to solicit new Title Loans. The Danville, Virginia TitleMax office made many loans to North Carolina residents, according to some unrefuted evidence more than to Virginians, and other unrefuted evidence is to the same effect regarding TitleMax operations in South Carolina – active solicitation of prospective borrowers known by TitleMax to be resident in North Carolina, and a volume of loan origination to North Carolinians at or above the rate to residents of the state where the TitleMax office is located. TitleMax also mailed to at least one North Carolina borrower written offers of $100 as a referral fee for each new borrower directed to TitleMax.

8. Ewings offered evidence, unrefuted by TitleMax, that while certain documents TitleMax asked him to sign appeared to provide for notarization, Ewings did not interact with anyone he understood to be a notary who appeared to be functioning in that capacity, and did not witness notarization of his signature. This was apparently the case for each of the Loans. Other evidence offered by Ewings, and unrefuted by TitleMax, was that a former TitleMax employee and notary was routinely called upon by TitleMax to notarize signatures on documents affixed elsewhere, by persons she had not met, from whom she had not obtained and could not obtain identification, and whose signatures she had not witnessed. The notary did not claim to have been asked to notarize, or to have notarized, Ewings's signature in particular.

9. For each of the Loans, Ewings and TitleMax each executed a Motor Vehicle Title Loan Agreement (Agreement) on a TitleMax form. Ewings signed each Agreement while at the TitleMax office in Danville. His signature appears to have been effected electronically rather than by manuscript or "wet" signature.

10. Each Agreement asserts a right of TitleMax to recover from Ewings "the reasonable costs of repossession and sale of the … Vehicle after [a] default," citing a Virginia statute. The Agreement states that it shall be governed by Virginia law.

11. Each Agreement contains an arbitration clause. That clause says "[t]he arbitrator shall apply applicable substantive law consistent with the [Federal Arbitration Act]" and that "[t]he arbitration hearing shall be conducted in the county of [Ewings's] residence," a county within 30 miles of that county, the county in which the transaction under the Agreement occurred, or "in such other place as shall be ordered by the arbitrator."

12.     The Hearing was conducted, for all relevant purposes, "in" Greensboro, Guilford County, North Carolina.  This arbitration proceeding and the related litigation (discussed above) originated and proceeded, at all times, in North Carolina.

13.     With respect to each of the Loans, TitleMax, directly or through an intermediary arranged by it, placed a lien on the Vehicle title, via filing(s) with DMV.

14.     TitleMax sent Ewings payments reminders by text message, as it commonly did with other North Carolina borrowers.  Ewings made payments to TitleMax via Western Union, through one or more of its locations in North Carolina.

15.     At 1:05 A.M. on November 19, 2018, Unlimited Asset Recovery, LLC (Unlimited) of McLeansville, North Carolina, a firm acting for TitleMax, "recovered" (as the firm's document reflects) the Vehicle from 2200 Linda Lane in Greensboro, the address shown for Ewings in the Agreements.  This recovery or repossession was in response to Ewings's default under the last (April 14, 2018) of the Loans.  Ewings had satisfactorily fulfilled the terms of the first two Loans. TitleMax had, prior to making the second and third Loans, released by filings with or communications to DMV the security interest in the Vehicle it had perfected in respect of each preceding Loan.

16.     Unlimited moved the Vehicle to a location in Guilford or Alamance County, North Carolina.  By a November 19, 2018 notice to Ewings, TitleMax advised that it would sell the Vehicle after December 4, 2018 unless Ewings paid:

[T]he full amount [he] owe[d] (not just the past due payments), including our expenses, which is:

    Principal:  $827.82

    Charges:  $150.94

    Expenses:  $350.00

17.     Ewings paid, in Guilford or Alamance County, the amount demanded by TitleMax to redeem the Vehicle, and it was returned to him.

## CONCLUSIONS OF LAW

1.     Ewings has two lines of legal argument.  The first is that each Loan is subject to, and violated, N.C. Gen. Stat. § 53-164 *et seq.* (the N.C. Consumer Finance Act, or CFA[3]) or, alternatively, N.C.G.S. § 24-2.1 *et seq.*, (the Usury Act), statutes specifically targeting types of loan or loan terms.  The second is that TitleMax is subject to and exposed to damages under N.C. Gen. Stat. § 75-1.1 *et seq.* (the Unfair and Deceptive Trade Practices Act, or UDTPA).  The

---

[3] N.C. Gen. Stat. § 53-190, the "Loans Made Elsewhere" component of the CFA, is a particular focus of the Parties' arguments.

UDTPA argument also has two parts, as the Arbitrator understands the argument. The first is that if Ewings is entitled to money under the CFA or Usury Act, or both, that amount is subject to trebling under the UDTPA, because violation of the CFA or Usury Act, on these facts, would as a matter of law violate the UDTPA. The second is that acts violating the CFA or Usury Act, on these facts, support both compensatory and treble damages under the UDTPA itself (whether or not compensatory relief is, or is also, available to Ewings under the CFA or Usury Act)

2.      TitleMax also has two main arguments. The first is that Virginia law solely controls its Loans to Ewings, and that the Loans and TitleMax' activities in respect of each are lawful under Virginia law. The second is that if North Carolina law is determined otherwise to apply in favor of Virginia law, that North Carolina law purporting to apply to "loans made elsewhere" is unconstitutional – and that nothing in valid North Carolina law, at least those laws at issue, provides a basis for relief to Ewings.

3.      Ewings seeks damages in respect each of his three TitleMax loans at issue. TitleMax has objected to consideration of the first two, arguing that Ewings did not make either a subject of his Demand. The Arbitrator agrees that TitleMax produced to Ewings disbursement and payment detail on all three Loans, without apparent objection. TitleMax' principal challenges are legal rather than factual anyway, and do not vary as to any of the Loans. To the extent the Demand is not clear what Loan or Loans Ewings challenges (and the Arbitrator need not and does not make a determination about that), TitleMax was not prejudiced. As such, the Arbitrator rejects TitleMax' argument that only the most recent Loan is properly before him.

4.      TitleMax also asserts affirmative defenses based on the statutes of limitations. The Arbitrator determines that no allegation or claim of Ewing is barred by any limitations statute or principle.

5.      The CFA purports to regulate certain loan contracts "made outside this State." It excepts "loan contracts in which all contractual activities ... occur entirely outside North Carolina," and contains a non-exclusive ("including") list of "contractual activities."

6.      The CFA is not the only North Carolina statute that purports to govern contracts that may have been "made" outside the State, partly (perhaps substantially) performed outside it, or both. Others include N.C. Gen. Stat. §§ 22B-2 (declaring "void and against public policy" provisions "in any contract, subcontract, or purchase order for the improvement of real property in this State" that specify non-N.C. law or an "exclusive forum" other than N.C.) and 66-193 (voiding any "provision in any contract between a sales representative and a principal purporting to waive any provision of this Article, whether by expressed waiver or by a contract subject to the laws of another state").

7.      Each Agreement was a "loan contract" within the meaning of the CFA. Each Agreement both contemplated by its terms and required for its performance "contractual activities" inside North Carolina. These included the recording by TitleMax (directly or indirectly) of a security interest in the State, the release by TitleMax of that security interest upon borrower fulfillment of the Agreement, and a remedy of vehicle repossession contemplated to occur, if pursued, in the

State. TitleMax in fact directly or through its third party representative entered the State to effect repossession of the Vehicle, on the strength of its recorded claim to title of the vehicle. It then effected its possession of the Vehicle in the State, received payment from Ewings for redemption of the possessed vehicle in the State, and returned possession to him in the State.

8.      The Arbitrator treats the CFA and Usury Act as constitutional. There are three main reasons for this. The first is that statutes are presumptively constitutional, and the Arbitrator is aware of no judicial decision declaring the CFA or Usury Act unconstitutional. The second is that the Arbitrator is reluctant to assume authority to treat, much less declare, a statute unconstitutional when no court with jurisdiction appears to have done so. Granting arbitral awards not to represent binding precedent either for courts or arbitrators, both parties have referred to and in some cases provided to the Arbitrator, as persuasive devices, arbitral awards in other matters implicating the legal issues in play here. The Arbitrator is particularly reluctant to roam into constitutional jurisprudence on the chance the award may be offered to and found to be persuasive by another arbitrator. The third is that, as noted above, the "loans made elsewhere" features of the CFA and Usury Act are not unique in purporting to impose North Carolina law on contracts that specify other law or that would, if *lex loci contractus* choice-of-law analysis was dispositive,[4] avoid North Carolina law. A determination that may have or, again, be argued or asserted to have repercussions for North Carolina statutes distinct from those at issue here is another reason to avoid constitutional challenges.

9.      Each Loan is subject to and violated the CFA. The Arbitrator applies North Carolina choice of law analysis, because North Carolina is the venue for this proceeding.

10.      TitleMax does not argue that any of the Loans conformed to either the CFA or the Usury Act. Assuming the Loans and TitleMax' activities with respect to them to have been lawful under Virginia law, that law offends North Carolina public policy as expressed in the CFA and Usury Act, and the Arbitrator on that basis declines to apply Virginia law.

11.      The Arbitrator separately concludes that the Agreements and Loans necessarily required, and actually involved, "contractual activities" contemplated by the terms of the Agreements to occur or that in fact occurred inside North Carolina. As an initial matter, the Arbitrator rejects the argument that § 53-190 defines "contractual activities" to include only "activities" through the point of execution by the Parties of the Agreements. The "contractual activities" described in the statute are expressed in exemplary rather than exclusive or comprehensive terms, and include activities that necessarily occur after an agreement to lend has been achieved, for example "delivery and receipt of funds."

12.      Taking "contractual activities" to mean activities necessary to effect the terms of the Agreements, some of those activities necessarily had to occur, and were in fact effected, within North Carolina. Indeed, the ability of TitleMax to effect and to perfect its security interest on the Vehicle, by interaction with the DMV and following the requirements that agency and North

---

[4] If dispositive and if that analysis, of itself, implicated law other than that of North Carolina. As stated elsewhere in this Award, the Arbitrator makes no determination in what State any of the Loans was "made."

Carolina law prescribe – that is, to pursue "activities" in North Carolina - are by all accounts but-for conditions to its willingness and commitment to lend. Ewings presented evidence suggesting a history of at least hundreds of car title loans by TitleMax to North Carolina residents, each with the same interaction with DMV as for the Loans.

13.     TitleMax also "c[ame] into this State to solicit or otherwise conduct activities" in regard to loans on terms that violated the CFA. These "activities" include repossession or "recovery" activities by TitleMax or others acting at its direction and active text and telephone solicitation for new loans of persons TitleMax knew to be in and residents of this State, for transactions that would, if consummated, necessarily require TitleMax to reach back into North Carolina to perfect its security.

14.     In summary, each of the Loans was subject to and violates offends the CFA and thus the UDTPA.[5] Ewings is entitled to principal compensation as provided below both under the CFA and as compensatory damages under the UDTPA.

15.     To the extent any of the Agreements remains subject to enforcement by TitleMax, or any of the Loans subject to collection activity, by operation of this Award each Agreement is deemed invalid and unenforceable. TitleMax may not pursue any collection activity or take or permit to be taken any action or report, such as an adverse credit report, as to Ewings in respect of any of the Agreements or Loans.

Based upon these Findings of Fact and Conclusions of Law, the undersigned Arbitrator makes the following award:

1.     Ewings is awarded $5,083.66 as principal compensation from TitleMax. This amount reflects the Arbitrator's resolution of disputed evidence and arguments regarding the amount properly at issue between the Parties. This amount shall bear interest at the North Carolina legal rate of 8% per annum from May 3, 2019;[6]

2.     Ewings's principal compensation is trebled under the UDTPA. As such, the total principal amount due from TitleMax to Ewings is $15,250.98. Of that total, $10,167.32 shall bear interest at the North Carolina statutory rate of 8% from the date of this Award until paid;

3.     Neither Party shall receive attorney's fees or other monetary relief from the other;

4.     To the extent punitive damages have been requested, they are denied.

The administrative fees of the American Arbitration Association (AAA) totaling $2,650.00 and the compensation of the arbitrator totaling $2,500.00 shall be borne as incurred.

---

[5] The Conclusions of Law as to the CFA obviate the need to reach Conclusions of Law as to the Usury Act.
[6] The date of the Demand. The Arbitrator was unable to determine any other date(s) on which pre-Award interest might appropriately be deemed to have begun on all or portions of the principal compensation amount.

13535399v1 26882.00015

The above sums are to be paid on or before 30 days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration. All claims and requests for relief, of any kind, not expressly granted or denied elsewhere in this Award are denied.

December 8, 2020
Date

Edward F. Hennessey, Arbitrator

13535399v1 26882.00015

AMERICAN ARBITRATION ASSOCIATION
Case No. 01-19-0002-5189

Carrie Ann Edwards, Claimant, vs. TitleMax of South Carolina, Inc., Respondent.

# **AWARD**

I, Jeffrey J. Davis, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, each represented by counsel, at an evidentiary hearing held on December 8, 2020, do hereby, AWARD, as follows:

At all relevant times, Claimant was, and remains, a citizen and resident of the state of North Carolina. Respondent TitleMax of South Carolina, Inc. ("TitleMax') was, and remains, a corporation organized and existing under the laws of the state of South Carolina.

Claimant's assert tort—not contract--claims against Respondent pursuant to North Carolina's Consumer Finance Act (NC Gen Stat 53). TitleMax made a car title loan to Claimant secured by Claimant's car title by recording a lien on that title in Raleigh, North Carolina. At all relevant times, that car was titled in North Carolina. A car title loan is a short-term loan product that is secured by the title to the borrower's motor vehicle. In Claimant's case, TitleMax charged Claimant annual rates well in excess of the 30% interest rates permitted by the North Carolina Consumer Finance Act.

Because Claimant is a North Carolina resident to whom Title Max has made a loan at annual rates of interest that far exceed the rates of interest permitted under North Carolina law, she has brought claims against TitleMax as follows: 1) for violations of the North Carolina Consumer Finance Act, N.C.G.S. § 53-164 *et seq.* and, in the alternative, a claim for violations of the North Carolina usury statute, N.C.G.S. § 24-2.1 *et seq.*; and (2) for unfair and deceptive trade practices, N.C.G.S. § 75–16.1(1). Claimant also seeks punitive damages.

A hearing was conducted over Zoom. The parties each submitted pre-hearing briefs. For the reasons set forth below, I award as follows:

## I. Respondent Has Violated The North Carolina Consumer Finance Act.

Case 1:19-cv-00321-CCE-JEP   Document 126-5   Filed 05/19/21   Page 17 of 38

The North Carolina Consumer Finance Act expressly applies to "Loans Made Elsewhere." N.C. Gen. Stat. § 53-190 provides:

(a) No loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.

(b) If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article.

The maximum allowable rate of interest permitted by the North Carolina Consumer Finance Act is 30% per annum.

The evidence establishes the following facts:

1. Claimant had a discussion with TitleMax while she was in North Carolina.

2. Claimant called TileMax from North Carolina.

3. Claimant made payments to TitleMax from North Carolina;

4. TitleMax came into North Carolina and used the North Carolina DMV to perfect a security interest in the motor vehicle;

5. TitleMax sent its agents into North Carolina to repossess Claimant's vehicle, which it subsequently returned to Claimant.

6. TitleMax regularly comes into North Carolina to record liens which is "conducting activities in regard to such loan contracts."

7. TitleMax regularly comes into North Carolina, through its agents, to repossess vehicles which is "conducting activities in regard to such loan contracts."

The North Carolina Consumer Finance Act applies to these tort claims, in short, because it says it does.

8. TitleMax charged Claimant an annual interest rate of 191.555%.

2                              01-19-0002-5189

## II. Claimant Is Entitled To Compensatory Damages for TitleMax's Violations Of The North Carolina Consumer Finance Act.

N.C. Gen. Stat. § 53-166(d) sets forth the penalty for a lender that violates the Consumer Finance Act:

(d) Additional Penalties. – Any contract of loan, the making or collecting of which violates any provision of this Article, or regulation thereunder, except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan. If an affiliate operating in the same office or subsidiary operating in the same office of a licensee makes a loan in violation of G.S. 53-180(i), the affiliate or subsidiary may recover only its principal on the loan.

TitleMax must return to Claimant all sums it has collected on the loan, which I determine to be $6,620.82. This includes all payments made including those sums that went to repayment of the principal and interest amount of the loans. This totals $6,620.82 in compensatory damages.

## III. Titlemax Has Engaged In Unfair and Deceptive Trade Practices.

A violation Chapter 53 is also a violation of Chapter 75. *State of NC v. NCCS Loans,* 624 S.E.2d 371, 378, 174 N.C. App. 630 (N.C. App. 2005) and *Odell v. Legal Bucks*, LLC, 665 S.E.2d 767 (N.C. App. 2008). The record evidence establishes that TitleMax did not disclose to Claimant that the Motor Vehicle Title Loan Agreements violated North Carolina law and the interest rates that it charged her violated the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws. On these facts, TitleMax committed an unfair and deceptive trade practice as a matter of law. When a party commits an Unfair Trade Practice, N.C. Gen. Stat. § 75-16 provides that the court "shall" treble the damages. Further, where the violation of Chapter 75 was "willful" and there was an unwarranted refusal by such party to fully resolve the dispute, as is the case here, a court may in its discretion award attorneys fees. "An act is "willful" within the meaning of N.C. Gen.Stat. § 75-16.1(1) if it is done voluntarily and intentionally with the view to doing injury to another." The record evidence establishes that TitleMax voluntarily and intentionally charged Claimant rates of interest in excess of the lawful amount and has retained all payments on the loans in violation of N.C. Gen. Stat. § 53-166(d). Therefore, I will award Claimant treble damages pursuant to N.C. Gen. Stat. § 75-16,

3                                   01-19-0002-5189

## IV. N.C.G.S. §53-190 Does Not Violate The Dormant Commerce Clause.

TitleMax asserts that the North Carolina Consumer Finance Action violates the Dormant Commerce Clause of the United States Constitution and asks the Arbitrator to so find. However, the Arbitrator finds the decision of the North Carolina Business Court in *State of North Carolina ex rel. Roy Cooper Attorney General and Ray Grace, Commissioner of Banks v. Western Sky Financial, LLC, et al.*, 2015 NCBC 84 (2015) to be both controlling and persuasive and, therefore, declines TitleMax's request.

THEREFORE, for the reasons set forth above, the undersigned Arbitrator does HEREBY ORDER as follows:

1. Claimant shall have and recover of TitleMax compensatory damages in the amount of $6,620.82 for TitleMax's violations of the North Carolina Consumer Finance Act.

2. That award is trebled to the amount of $19,862.46 and TitleMax is directed to pay the sum of $19,862.46 to Claimant within thirty (30) days from the date of this Order.

3. The fees of the American Arbitration Association, in amount of $2,495.00, and the compensation of the Arbitrator in the amount of $2,500.00 both shall be borne as incurred.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

_____December 15, 2020_____
Date

Arbitrator

4                                    01-19-0002-5189

# AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| ANDREA SELLS, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No.: 01-19-0001-3794 |
| | ) | Arbitrator: Reagan Weaver |
| | ) | |
| TITLEMAX OF VIRGINIA, INC. dba | ) | |
| TITLEMAX, | ) | |
| | ) | |
| Respondent. | ) | |

## INTERIM AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the Parties and after the decision of the Honorable Loretta C. Biggs, District Judge of the United States District Court for the Middle District of North Carolina, granting Claimant's (and others') Motion to Compel Arbitration, entered April 22, 2020, and having been duly sworn and having duly heard on October 22, 2020 the allegations and the proofs of the Parties represented by Drew Brown of Brown, Faucher, Peraldo & Benson, PLLC for the Claimant and Jason D. Evans and John E. Komisin for the Respondent, and having heard testimony from Andrea Sells and Jason Brown for the Claimant, and Lana Garner and Damian McBride for the Respondent, and having considered the Parties' oral argument, briefs, including reply briefs, and cases cited by the Parties, hereby issue this INTERIM AWARD as follows:

## ISSUES

I.  Did Respondent violate provisions of the North Carolina Consumer Finance Act, to wit, the provisions of the statute that relate to "Loans Made Elsewhere," N.C. Gen. Stat. 53-190(a) and (b) when it entered into a motor vehicle title loan with Claimant?

II.  Did Respondent violate the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. 75-1.1 when it entered into the subject motor vehicle title loan with Claimant?

III.  If Respondent violated either or both of the alleged North Carolina statutes, what are the damages?

## REASONED AWARD

On or before November 2, 2017, Claimant Sells found herself in need of a loan to help with debts and her fiancé's job situation. She saw a television ad for motor vehicle title loans and in an internet search she identified Respondent, TitleMax of Virginia, Inc. (hereafter, TitleMax) as a prospective source for such a loan. Sells called the closest TitleMax store in Danville, Virginia, as it was only about 45 minutes away from her home in Greensboro, North Carolina. The individual answering the phone for the store spoke

with her. In that conversation, she was asked her address and whether she had the title to her car and its year and make. She told the representative that she needed $3,400. The representative said that she needed to come see them with the car and the title so they could inspect the car and evaluate it. Sells developed an opinion from the conversation that the loan would be pretty easy to obtain although she understood that TitleMax had to see the car before she could get the loan. Soon after this conversation, Sells drove the car with her fiancé to the Danville store. The store representative inspected the car and Sells was given a loan for $3,420 at an annual interest rate of 167.2424 percent, and they entered into a written contract on November 2, 2017. Subsequent to making the loan to Sells, TitleMax sent the necessary paperwork to the North Carolina Department of Motor Vehicles to record a lien on the Sells vehicle to perfect its security interest. Thereafter, Sells made regular timely monthly payments on the loan until July, 2018 when she paid the loan off early.[1]

## Issue I

N.C. Gen. Stat. 53-190(a) states the following:

> No loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.

The first sentence of this statute prohibits the enforcement of a loan contract made outside the State equaling $15,000.00 or less that charges or contracts for or provides for consideration received that exceeds what is allowed, i.e., (in this case) 30% interest (*See* N.C. Gen. Stat. 53-176(a)(1) specifying loans less than or equal to $4,000.00 can collect 30% interest per annum). The second sentence nullifies the first sentence's prohibition if entirely all contractual activities occur outside the State which is to say that if any contractual activities associated with such a loan do occur within the state, then the loan may not be enforced.

What the legislature intended by the language of this paragraph can be debated. The examples of conduct identified in the second sentence all sound like contract formation-type activities, but the words of the statute speak of "all contractual activities" without stating any restrictions on whether it intends to regulate only formation activities or also post-formation activities. The more reasonable interpretation of the statutory language in question is to acknowledge the sweeping nature of the term "all," to include both formation and post-formation activities.

The statutory language also leaves open the interpretation of the phrase, "occur entirely outside North Carolina." One question that arises is whether a discussion between a lender physically out-of-state and a prospective borrower physically within North Carolina is a discussion occurring entirely outside or inside North Carolina. From the lender's perspective the discussion is entirely from outside-the-state. From the borrower's perspective the discussion is entirely in-state. The fact that one party to a discussion is physically inside the state excludes the possibility that the discussion could be considered entirely outside-the-state. The more reasonable reading of the phrase, "occur entirely outside North Carolina" is to prohibit all contact between a borrower and a lender for an amount falling within the parameters of the statute unless both parties are physically outside North Carolina at all times for all contractual activities.

---

[1] Both parties submitted affidavits which were read but have not been relied upon to establish any conclusions. Testimony at the hearing was the sole source of factual findings with the exception of the deposition of Claimant at which both parties were represented.

Case 1:19-cv-00321-CCE-JEP   Document 126-5   Filed 05/19/21   Page 22 of 38

In this case, Respondent's agent in its Danville store had a discussion with Claimant while Claimant was in North Carolina during which Claimant told the agent that she wanted a loan for $3,400.00. The agent asked Claimant Sells questions concerning the make and model of her car and whether she had the title to the car. The agent explained that Sells would have to bring the car to the Danville office with the title, and that when she did so, the car could be inspected and evaluated before Respondent could give her the loan. Based on their discussion, Sells developed confidence that if she did what the agent said, she would be able to get the loan she wanted. Soon thereafter, she and her fiancé drove to the Danville store where she was able to obtain the loan without complications.

The statute specifically lists "contractual activities," if they occur in North Carolina, that would nullify the prohibition of enforcing such a contract. One of the activities listed is "discussion." Another example is "negotiation." Whether Claimant and Respondent engaged in negotiation might be debated, although from this arbitrator's perspective, negotiation in its earliest stages did occur in North Carolina because Respondent convinced Claimant to leave North Carolina to come to the Danville store. Whether the parties engaged in "discussion" while Claimant was in North Carolina was proven though because they talked about what documents—the title—and property—the car—the representative would need to see, as well as what the make and model of the car was and the amount she wanted to borrow. The conversation establishes that the parties had a substantive *discussion* about the prospective loan. Whether the parties could have had less of a conversation that did not become a "discussion" is a question that does not have to be addressed. The conversation that occurred was more than enough to show that the statute's prohibited "discussion" occurred, and it brought the lender within the regulated umbrella of the statute's first sentence.

Claimant highlights that the discussion that Sells had with the Danville store representative occurred before she signed the contract with TitleMax. The contract contains choice of law provisions that proscribe the application of law other than North Carolina's. The Respondent should not be allowed to escape responsibility under North Carolina law for its prior conduct of engaging in discussion with Sells by choosing governing law that would permit the conduct prohibited by North Carolina.

Respondent argues that the statute speaks in terms of *enforcement* so as to suggest that the North Carolina legislators intended this paragraph only to allow actions by lenders against borrowers if and only if entirely all contractual activities occurred outside of the state. Respondent's interpretation also limits the application of the paragraph to actions based on only contract formation activities as opposed to post-contract activities such as receipt of payments or collection efforts. Yet enforcement action of any kind necessarily is post-contractual. While the paragraph can be read to be only a shield for lenders if all contract formation activities occur entirely outside North Carolina, there are no words appearing in the paragraph that restrict a borrower from instituting an action of his or her own against the lender based on contract formation or post-contract activities. Hence, Claimant filed suit herself under this statute.

Respondent violated Section 53-190(a). It is established that the parties entered into a contract, Joint Exhibit C from the hearing, entitled Motor Vehicle Title Loan Agreement and Federal Truth-In-Lending Disclosures, dated 11/02/2017. It is also established that the interest rate charged the Claimant was, as it appears on the first page of the agreement, 167.2424 % per annum, and clearly exceeds the statutory rate maximum of 30% provided specifically in N.C. Gen. Stat. 53-176(a)(1). The Respondent does not qualify for the hold harmless provision found in the second sentence of the paragraph because it engaged in discussion about the loan, if not early negotiation, as well, while the Claimant was in North Carolina.

3                                01-19-0001-3794

N.C. Gen. Stat. 53-190(b) states the following:

> If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article.

This paragraph addresses expressly a lender coming into North Carolina to either "solicit or otherwise conduct activities in regard to such loan contracts." The 'activities in regard to such contracts' is not defined, but the paragraph regulates the lender's conduct as being "subject to the requirements of the Article." Compared to paragraph (a), paragraph (b) appears to cover the lender's conduct more broadly in that it refers to "activities *in regard to such loan contracts*" (emphasis added), and it makes no attempt to list any examples of prohibited conduct by lenders. In that case, (b) appears to expand the coverage of N.C. Gen. Stat. 53-190.

Did Respondent come to the State to "solicit" loan contracts? The evidence submitted at the hearing did not establish that Respondent solicited Claimant. First, Claimant initiated the telephone call to Respondent's Danville store. Second, there was no reported conduct by Respondent's agent to suggest that its agent tried to, for example, tell Claimant what a good deal she could get by doing business with it, or that she couldn't find a better, quicker or easier deal. Any of these suggestions could be construed to be a solicitation of Claimant, and no evidence of such statements or anything like them was admitted at the hearing. Thus, there was no solicitation by Respondent.

Did Respondent come into the State to "conduct activities in regard to [its] loan contract[s]"? Claimant contends that this paragraph would apply to Respondent's receipt of monthly payments from Claimant. While arguably such receipt of payments is a connection with the State, it does not represent the circumstance where Respondent "comes into this State." The connection made by receiving payments was passive and from the evidence admitted at the hearing did not rise to the level of coming into the State. In the analysis of the acts of the Respondent in the telephone call discussion, Respondent's engagement in conversation with Claimant was substantive while its receipt of payments was, from the evidence at the hearing, not a substantive engagement.[2]

What *was* a substantive engagement and constituted coming into the State was Respondent's sending of its lien application into the North Carolina Division of Motor Vehicles office to register its lien. This action constituted an "activit[y] in regard to such loan contracts." Through this action Respondent strengthened its claim to Sells' motor vehicle in the event that she ever defaulted on her loan obligations. This was a voluntary coming into the State to gain the benefit of perfecting its security interest, and is sufficient in and of itself to find that Respondent violated N.C. Gen. Stat. 53-190(b).

The violation of N.C. Gen. Stat. §53-190(a) and (b), separately or together, entitle the Claimant under N.C. Gen. Stat. §166(d) to a recovery of the amount she borrowed and repaid for a recovery of $6,805.14 *See,* Exhibit D.

<u>Which State's Law Applies?</u>

---

[2] However, the receipt of payments from any loan that violates a provision of the North Carolina Consumer Finance Act is itself declared to be a violation of N.C. Gen. Stat. 53-166(d).

4                                         01-19-0001-3794

Respondent argues against the application of North Carolina law to this dispute. It contends that the terms of the contract that Sells signed in the Danville, Virginia store expressly declared that Virginia law should govern the agreement. As previously noted, Respondent engaged in prohibited conduct before Claimant left North Carolina to go to Danville, Virginia to enter into the loan agreement. To allow the Respondent to escape its responsibility for its previous conduct by sanitizing its acts with a choice of law provision is inappropriate. Further, to then rely on the choice of law provision or, as Respondent asserts, the *lex loci contractus* doctrine alternatively, to escape responsibility for violating N.C. Gen. Stat. §53-190(a) and (b) is also inappropriate.

Respondent contends that if for whatever reason the choice of law term of the contract is not applied, then the fact that the contract was signed in Virginia should prevent the application of North Carolina law. It asserts that the principle of *lex loci contractus* should apply in that the last act that established the contract between the parties occurred in Virginia, therefore, Virginia law should control. On the other hand, Claimant argues that the law cited by the North Carolina Business Court in *State ex rel. Cooper v. Western Sky Financial, LLC*, 2015 NCBC 84, 2015 NCBC 87 (Aug. 27, 2015) should control, but the case itself is not precedent for this case. The *Cooper* court did note points of North Carolina law that this arbitrator finds more persuasive in determining which law should apply to the conduct of the Respondent in making its loan with Claimant.

*Cooper* notes that "North Carolina will not enforce a choice of law provision in a contract where the chosen law would 'violate a fundamental policy of [North Carolina] of otherwise applicable law.'" (Citing *Behr v. Behr*, 46 N.C. App. 694, 696 (1980) *See also, Davis v. Davis*, 269 N.C. 120 (1967) ("It is thoroughly established as a broad general rule that foreign law or rights based thereon will not be given effect or enforced if opposed to the settled public policy of the forum" quoting 15A C.J.S. Conflict of Laws §4(4)a); *Bundy v. Commercial Credit Co.* 200 N.C. 511 (1931); *Burrus v. Witcover*, 158 N.C. 384 (1912) ("The general doctrine, that a contract, valid where it is made, is valid also in the courts of any other country or state, when it is sought to be enforced, even though, had it been in the latter country or state, it would be illegal, and hence unenforceable, is subject to several exceptions: . . . (3) when the contract violates the positive legislation of the state of the forum—that is, is contrary to the Constitution or statutes; and (4) when the contract violates the public policy of the state of the forum. These exceptions are grounded on the principle that the rule of comity is not a right of any state or country, but is permitted and accepted by all civilized communities from mutual interest and convenience, and from a sense of the inconvenience which would otherwise result, and from moral necessity to do justice, in order that justice may be done in return." quoted from *Contracts*, 9 Cyc. 674). North Carolina's policy regarding interest charged to borrowers is stated expressly in N.C. Gen. Stat. 24-2.1(g): "[i]t is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." The provisions of N.C. Gen. Stat. 53-176 limit the interest that can be charged to 30%. As noted previously, the interest charged Claimant exceeded by more than five times the maximum chargeable under North Carolina law. Charging such an interest rate violates a fundamental public policy of North Carolina as established in the cited Consumer Finance Act which invalidates the application of Virginia law by either choice of law provision or by *lex loci contractus*.

The Commerce Clause

TitleMax cites a Seventh Circuit opinion that arose when another motor vehicle title lending company sued the state of Indiana over Indiana's attempt to control title lending to its residents. *Midwest Title Loans, Inc. v. David H. Mills, Director of the Indiana Department of Financial Institutions*, 593 F.3d 660 (7th Cir. 2010). In that case, Indiana defended itself from a suit to enjoin the application of an Indiana law that attempted to regulate loans made to Indiana residents from Midwest stores that were outside Indiana based on Midwest having advertised or solicited loans in Indiana. The Seventh Circuit affirmed a district

5                        01-19-0001-3794

court ruling that granted injunctive relief to Midwest and founded its ruling on the Commerce Clause of the United States Constitution.

In the Midwest case, Indiana's statute attempted to regulate out of state lenders like Midwest even though the only connection Indiana could claim with Midwest was its advertising in Indiana or its solicitation of its residents, i.e. its commercial speech. In the case at hand, North Carolina law regulates TitleMax on the basis of whether it engages in "contractual activities" with its borrowers in North Carolina and/or whether it comes into the State to "otherwise conduct activities" regarding loan contracts. This regulatory framework is different from what Indiana attempted to do with its regulations that prompted the Midwest suit. In the case at hand, as noted above, TitleMax conducted activities in the state via the conversation it had with Claimant while she was in the state and when it communicated directly with the North Carolina Division of Motor Vehicles regarding the perfection of its security interest. These activities are distinguished from the advertising that Midwest did in Indiana. Thus, the applicability of the Midwest case is of limited value to the analysis of this case, not to mention that a Seventh Circuit opinion is not controlling in this circuit.

The case cited by Midwest in the Fourth Circuit that is closest to applicability is not a consumer lending case, but a South Carolina commercial case involving the sale of Volvo trucks in Georgia. *See, Carolina Trucks and Equipment, Inc. v. Volvo Trucks of North America, Inc.,* 492 F.3d. 484 (4th Cir. 2007). There the case turned on "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id. at 489.* In the case at hand the North Carolina statute operates to control conduct that occurs *in North Carolina* with individual borrowers with whom TitleMax chooses to conduct business. If, indeed, as the North Carolina statute states, "all contractual activities" occur out-of-state, then the lender escapes regulation. It is when TitleMax comes into the State that it finds itself and its conduct subject to regulation. As previously noted, TitleMax came into North Carolina to engage in discussion, if not also negotiation, by accepting the call from Claimant and engaging in discussion with her. Further, after making the loan to Claimant, TitleMax communicated directly with the North Carolina Division of Motor Vehicles to record the lien on Claimant's vehicle. These activities were conducted within North Carolina and are, under *Carolina Trucks,* not violative of the Commerce Clause. Accordingly, there is no violation of the Commerce Clause to be found from the operation of the North Carolina statute.


**Issue II**

N.C. Gen. Stat. 75-1.1

A violation of the North Carolina Consumer Finance Act, Chapter 53 of the North Carolina General Statutes, may be a *per se* violation of Chapter 75. *State of NC v. NCCS Loans,* 174 N.C. App. 630 (2005). In this case the Court held:

> Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive practices." *Stanley v. Moore, 339 N.C. 717,723 (1995).* In this regard, we note that it is a "paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. §24-2.1 (2003). Defendants' practice of offering usurious loans was a clear violation of this policy. We conclude that the trial court did not err by ruling as a matter of law that this constitutes unfair or deceptive trade practices, in violation of N.C. Gen. Stat. §75-1.1 (2003).

Case 1:19-cv-00321-CCE-JEP   Document 126-5   Filed 05/19/21   Page 26 of 38

The case at hand is similar. It establishes that Respondent charged Claimant a rate of interest that was usurious in that it exceeded by more than five times the rate of interest allowed by the North Carolina Consumer Finance Act, N.C. Gen. Stat. §53-176(a)(1). This violated a paramount public policy of North Carolina as stated in N.C. Gen. Stat. §24-2.1 to protect its resident borrowers. For the above reasons, the Loan Agreement between the parties violated North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. 75-1.1, and was a *per se* violation of that statute.

## Issue III

Having found that the cited provisions of the North Carolina Consumer Finance Act and the North Carolina Unfair and Deceptive Trade Practices Act were violated as set out above, this arbitrator finds that the damages suffered by Claimant, $6,805.14 should be trebled for an Award of $20,415.42 pursuant to the provisions of N.C. Gen. Stat. 75-16.

WHEREFORE, Respondent is ordered to pay in damages the sum of $20,415.42 to the Claimant. The administrative fees of the American Arbitration Association (AAA) totaling $2,400.00 and the compensation of the arbitrator totaling $2,500.00 shall be borne as incurred.

This Interim Award is in full settlement of the merits of all claims submitted to this Arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant as set forth above. The Arbitrator retains jurisdiction to address Claimant's claims for reasonable attorney fees and costs. Claimant shall submit its accounting of such reasonable attorney fees and costs and any supporting documents related thereto to the Arbitrator within ten (10) days of the date of this Interim Award. Respondent's counsel shall submit any responsive statement and supporting documents within twenty (20) days of this Interim Award. Upon and after such submissions, the matter shall be deemed submitted to the Arbitrator for determination in a Final Award.

This Interim Award shall remain in full force and effect until the Arbitrator renders a Final Award.

This the 4 day of January, 2021.

*Reagan H. Weaver*
Reagan H. Weaver
Arbitrator

7                               01-19-0001-3794

# AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| ANDREA SELLS, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No.: 01-19-0001-3794 |
| | ) | Arbitrator: Reagan Weaver |
| | ) | |
| TITLEMAX OF VIRGINIA, INC. dba | ) | |
| TITLEMAX, | ) | |
| | ) | |
| Respondent. | ) | |

## FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the Parties, and following the entry of an INTERIM AWARD on January 4, 2021, and having received and reviewed submissions by both parties regarding the issue of attorney fees, do hereby issue this FINAL AWARD addressing the single remaining issue of attorney fees to be received by Claimant's counsel:

Having previously found the Claimant to be the prevailing party and that Respondent violated the North Carolina Unfair and Deceptive Trade Practices Act which provides for the imposition of attorney fees for the prevailing party, and finding that Respondent unwarrantedly refused to fully resolve the matter, do hereby award Claimant the sum of $15,425.00 as attorney fees based on a calculation of 61.7 hours of compensable time at a rate of $250.00 per hour.

The administrative fees of the American Arbitration Association (AAA) totaling $2,400.00 and the compensation of the arbitrator totaling $2,500.00 shall be borne as incurred.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

This the __9__ day of February, 2021.


_Reagan H. Weaver_
Reagan H. Weaver
Arbitrator

Monica Smith, Claimant, vs. F&B Financial Services., Respondent.

## **AWARD**

I, Jeffrey J. Davis, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and oral hearings having been waived in accordance with the Rules, and having fully reviewed and considered the written documents submitted to me by the Claimant, represented by James Faucher of Brown, Faucher, Peraldo & Benson, PLLC and the Respondent, represented by non-attorney Faithe Andrews of F&B Financial Services, LLC, do hereby, AWARD, as follows:

At all relevant times, Claimant was, and remains, a citizen and resident of the state of North Carolina. Claimant asserts tort—not contract--claims against Respondent pursuant to the North Carolina Consumer Finance Act, N.C.G.S. § 53-164 *et seq.* and, in the alternative, a claim for violations of the North Carolina usury statute, N.C.G.S. § 24-2.1 *et seq.*; and (2) for unfair and deceptive trade practices, N.C.G.S. § 75–16.1(1). Respondent made a car title loan to Claimant secured by Claimant's car title by recording a lien on that title in Raleigh, North Carolina. At all relevant times, that car was titled in North Carolina. A car title loan is a short-term loan product that is secured by the title to the borrower's motor vehicle. In Claimant's case, Respondent charged Claimant annual rates well in excess of the 30% interest rates permitted by the North Carolina Consumer Finance Act.

For the reasons set forth below, I award as follows.

### I. Respondent Has Violated the North Carolina Consumer Finance Act.

The North Carolina Consumer Finance Act expressly applies to "Loans Made Elsewhere." N.C. Gen. Stat. § 53-190 provides:

(a) No loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.

(b) If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to

1.

Case 1:19-cv-00321-CCE-JEP   Document 126-5   Filed 05/19/21   Page 29 of 38

such loan contracts, then such lender shall be subject to the requirements
of this Article.

The maximum allowable rate of interest permitted by the North Carolina Consumer Finance Act is 30% per annum.

The evidence establishes the following facts:

1. Claimant had a discussion with Respondent while she was in North Carolina.
2. Claimant called Respondent from North Carolina.
3. Claimant made payments to Respondent from North Carolina;
4. Respondent came into North Carolina and used the North Carolina DMV to perfect a security interest in the motor vehicle;
5. Respondent regularly comes into North Carolina to record liens which is "conducting activities in regard to such loan contracts."
6. Respondent charged Claimant an annual interest rate of 225.0029%.

## II. Claimant Is Entitled to Compensatory Damages for Respondent's Violations of The North Carolina Consumer Finance Act.

N.C. Gen. Stat. § 53-166(d) sets forth the penalty for a lender that violates the Consumer Finance Act:

(d) Additional Penalties. – Any contract of loan, the making or collecting of
which violates any provision of this Article, or regulation thereunder,
except as a result of accidental or bona fide error of computation is void,
and the licensee or any other party in violation shall not collect, receive, or
retain any principal or charges whatsoever with respect to the loan. If an
affiliate operating in the same office or subsidiary operating in the same
office of a licensee makes a loan in violation of G.S. 53-180(i), the
affiliate or subsidiary may recover only its principal on the loan.

Respondent must return to Claimant all sums it has collected on the loan, which I determine to be $4,574.33. This includes all payments made including those sums that went to repayment of the principal and interest amount of the loans. This totals $4,5744.33in compensatory damages.

## III. Respondent Has Engaged In Unfair and Deceptive Trade Practices.

A violation Chapter 53 is also a violation of Chapter 75. *State of NC v. NCCS Loans,* 624 S.E.2d 371, 378, 174 N.C. App. 630 (N.C. App. 2005) and *Odell v. Legal Bucks*, LLC, 665 S.E.2d 767 (N.C. App. 2008). The record evidence establishes that Respondent did not disclose to Claimant that the Motor Vehicle Title Loan Agreements violated North Carolina law and the interest rates that it charged her violated the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws. On these facts, Respondent committed an unfair and deceptive trade practice as a matter of law. When a party commits an Unfair Trade Practice, N.C. Gen. Stat. §* 75-16 provides that the court "shall" treble the damages. Further, where the violation of Chapter 75 was "willful" and there was an unwarranted refusal by such party to fully resolve the dispute, as is the case here, a court may in its discretion award attorneys fees. "An act is "willful" within the meaning of N.C. Gen.Stat. §

2.

CASE NO. 01-20-0003-7989

75–16.1(1) if it is done voluntarily and intentionally with the view to doing injury to another." The record evidence establishes that Respondent voluntarily and intentionally charged Claimant rates of interest in excess of the lawful amount and has retained all payments on the loans in violation of N.C. Gen. Stat. § 53-166(d). Therefore, I will award Claimant treble damages pursuant to N.C. Gen. Stat. §* 75-16,

IV. <u>N.C.G.S. §53-190 Does Not Violate The Dormant Commerce Clause.</u>

Respondent asserts that the North Carolina Consumer Finance Action violates the Dormant Commerce Clause of the United States Constitution and asks the Arbitrator to so find. However, the Arbitrator finds the decision of the North Carolina Business Court in *State of North Carolina ex rel. Roy Cooper Attorney General and Ray Grace, Commissioner of Banks v. Western Sky Financial, LLC, et al.,* 2015 NCBC 84 (2015) to be both controlling and persuasive and, therefore, declines Respondent's request.

THEREFORE, for the reasons set forth above, the undersigned Arbitrator does HEREBY ORDER as follows:
1. Claimant shall have and recover of Respondent compensatory damages in the amount of $4,574.33 for Respondent's violations of the North Carolina Consumer Finance Act.
2. That award is trebled to the amount of $13,722.99 and Respondent is directed to pay the sum of $13,722.99 to Claimant within thirty (30) days from the date of this Order.
3.  The fees of the American Arbitration Association, in amount of $1,700.00 and the compensation of the Arbitrator in the amount of $1,500.00, both shall be borne as incurred.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

_____April 7, 2021_____
                Date

                                            Arbitrator

3.

CASE NO. 01-20-0003-7989

|  |  |  |
|---|---|---|
| KIMBLE, RAYFORD | ) | |
|     Claimant, | ) | |
| v. | ) | Reference No. 1440007063 |
| | ) | |
| TITLEMAX OF SOUTH CAROLINA | ) | |
|     Respondent. | ) | |

## INTERIM AWARD
## ORDER No. 3

### Background

    This matter was referred to arbitration after Claimant and numerous other plaintiffs filed a Complaint in North Carolina state court against Respondent, as well as several related companies. After removal to federal court, the U.S. District Court for the Middle District of North Carolina entered an Order compelling arbitration, and on May 18, 2020, Claimant sent a JAMS Demand for Arbitration Form by email. Pursuant to the undersigned's February 3, 2021 Order, the parties agreed to submit briefs "on the preliminary legal issue to be resolved, namely, whether the North Carolina Consumer Finance Act (specifically, the 'loans made elsewhere provision') applies to Claimant's case." The undersigned has reviewed the parties' submissions and hereby enters the following Award:

### Findings of Fact

1. Claimant Rayford Kimble ("Claimant") is a resident of North Carolina.
2. Respondent TitleMax of South Carolina ("TitleMax") is a Supervised Lender authorized by the South Carolina Department of Consumer Affairs engaged in the business of making supervised loan agreements in South Carolina.
3. In October 2016, Claimant initiated a telephone call from North Carolina to TitleMax's Fort Hill, South Carolina ("Fort Hill") office and had a discussion with TitleMax personnel regarding Claimant's interest in obtaining a loan secured by the title on his motor vehicle.
4. TitleMax personnel directed Claimant to bring his motor vehicle and title to the Fort Hill office for purposes of continuing the discussion and for Claimant to complete the paperwork and vehicle inspection required to be approved for a loan.
5. Claimant executed loan agreements at TitleMax's Fort Hill office on October 24, 2016, October 28, 2016, and May 26, 2017 for a total loan amount of approximately $10,000.00 and an annual interest rate of 100%.
6. After Claimant's execution of the loan agreements, TitleMax personnel came into North Carolina to file liens with the North Carolina DMV thereby perfecting a security interest in Claimant's motor vehicle.

7. TitleMax employees/agents regularly come into North Carolina to record liens against titles securing loans entered with North Carolina residents.
8. TitleMax employees/agents regularly make calls and/or send collection letters to North Carolina residents when they fall behind on scheduled loan payments.
9. TitleMax regularly comes into North Carolina through its agents to repossess motor vehicles when parties default on their loans.
10. In October 2017, Claimant repaid TitleMax the total amount due pursuant to his loan agreements.

## I.    The North Carolina Consumer Finance Act Governs

Claimant has brought his tort claims based on the North Carolina Consumer Finance Act, specifically, N.C.G.S. §53-190 which provides:

(a) No loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. §53-173 and G.S. §53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.

(b) If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit *or otherwise conduct activities in regard to such loan contracts*, then such lender shall be subject to the requirements of this Article. (emphasis supplied)

Based on the foregoing Findings of Fact and pursuant to N.C.G.S. §53-190 (b), the undersigned concludes that TitleMax is a lender who makes loan contracts outside North Carolina in the amount or of the value of fifteen thousand dollars ($15,000) or less, and comes into North Carolina to otherwise conduct activities in regard to such loan contracts, and therefore, is subject to the requirements of the North Carolina Consumer Finance Act. Therefore, because the maximum allowable rate of interest permitted by the North Carolina Consumer Finance Act § 53-176 (a) is 30% for loans not exceeding $10,000 and 18% for loans in excess of that amount, the interest charged by TitleMax for the subject loans made to Claimant violates North Carolina law.

Respondent's argument that the North Carolina Consumer Finance Act does not apply to its loan agreements with Claimant due to the South Carolina choice of law provision contained in the loan agreements lacks merit. The loan agreements are not enforceable under North Carolina law and offend its established public policy of protecting its citizens from being charged excessive interest rates. See *State v. Western Sky, Fin., LLC,* 2015 NCBC 84 (2015). Further,

2

the undersigned declines to expand her authority as an Arbitrator to declare the North Carolina Consumer Finance Act unconstitutional.

Turning to the remedy for Respondent's violation of the Act, one must look to N.C.G.S. § 53-166(d) which allows compensatory relief and states that loans that violate the Act "shall be void and the licensee or any other party in violation shall have no right to collect, receive or retain any principal whatsoever with respect to such loan." Accordingly, Claimant is entitled to recover from Respondent compensatory damages for the payments made which total $21,954.34.

## II.     The North Carolina Unfair and Deceptive Trade Practices Applies

Claimant also seeks an award of treble damages pursuant to the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §75.1.1 et seq., in connection with Claimant's claim for damages under the North Carolina Consumer Finance Act. The fundamental purpose of Chapter 75 is to protect North Carolina consumers. Guided by that principle, a business practice is actionable under Chapter 75 when it can be considered unethical, unscrupulous, or deceptive. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (1987). A violation of Chapter 53 is a violation of Chapter 75 as a matter of law. *State of NC v. NCCS Loans*, 624 S.E.2d 371, 378, 174 N.C. App. 630 (2005) squarely addresses this issue. There, the Court held:

> Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive practices." *Stanley v. Moore*, 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995). In this regard, we note that it is a "paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. §24-2.1 (2003). Defendants' practice of offering usurious loans was a clear violation of this policy. We conclude that the trial court did not err by ruling as a matter of law that this constitutes unfair or deceptive trade practices, in violation of N.C. Gen. Stat. §75-1.1 (2003).

Additionally, *Odell v. Legal Bucks*, LLC, 665 S.E.2d 767 (N.C. App., 2008) is compelling. The Odell Court held:

> Although Defendants disclosed the terms of the advance to Plaintiff, Defendants did not inform Plaintiff that she was executing a contract that violated the Consumer Finance Act. Therefore, Defendants' conduct "had the capacity to deceive," as Defendants did not disclose the actual nature of the transaction to Plaintiff. Further, Defendants' contract with Plaintiff for an illegal advance violated "the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina

3

interest laws." N.C. Gen. Stat. § 24-2.1(g) (2007). On these facts, we hold that Defendants committed unfair and deceptive trade practices as a matter of law.

Based on the foregoing authority, the undersigned concludes that Respondent's conduct in making Claimant loans with an annual rate of interest in excess of 100% in violation of the North Carolina Consumer Finance Act, in not disclosing to Claimant the illegality of the loan and thereafter re-entering North Carolina to record the liens using North Carolina legal entities offends the sound public policy of North Carolina and constitutes unfair, unethical and unscrupulous business practices within the meaning of Chapter 75. Accordingly, Claimant is entitled to recover treble damages in the amount of $65,863.02.

THEREFORE, for the reasons set forth above, the undersigned Arbitrator does hereby ORDER as follows:

1. Claimant Rayford Kimble shall have and recover of Respondent TitleMax of South Carolina compensatory damages in the amount of $21,954.34 for Respondent's violations of the North Carolina Consumer Finance Act.
2. Said award is trebled to the amount of $65,863.02 and Respondent is directed to pay the sum $65,863.02 to Claimant within thirty (30) days from the date of the Final Award to be issued in this matter.
3. Claimant is entitled to an award of reasonable attorney's fees pursuant to N.C.G.S. §75-16.1. Claimant shall submit to the Arbitrator his attorney's fees affidavit within ten (10) days of the date of this Interim Award. Respondent shall be entitled to submit a response to Claimant's attorney's fees submission within ten (10) days of it being filed with JAMS.

All arguments raised by the parties have been considered. Except for the Claimant's request for an award of his reasonable attorney's fees, all claims submitted to this Arbitration are determined to be resolved. All claims not expressly granted herein are hereby denied.

Dated: April 26, 2021

Judge Gail S. Tusan
Arbitrator

4

# SERVICE LIST

**Case Name:** Kimble, Rayford vs. TitleMax of South Carolina, Inc.

**Reference #:** 1440007063

**Panelist:** Tusan, Gail S.,

**Hear Type:** Arbitration

**Case Type:** Business/Commercial

---

## Ben Bollinger

Troutman Pepper Hamilton Sanders, LLP

Ben Bollinger
301 S. College St.
34th Floor
Charlotte, NC 28202
ben.bollinger@troutman.com

Respondent
Phone: 704-998-4050

**Party Represented:**
TitleMax of South Carolina, Inc.

## Drew Brown

Brown, Faucher, Peraldo, et al.

Drew Brown
822 N Elm St
Suite 200
Greensboro, NC 27401
drew@greensborolawcenter.com
Assistant's Emails:
kellie@greensborolawcenter.com

Claimant
Phone: 336-478-6000

**Party Represented:**
Rayford Kimble

## Jason D. Evans

Troutman Pepper Hamilton Sanders, LLP

Jason D. Evans
301 S. College St.
34th Floor
Charlotte, NC 28202
Jason.Evans@troutman.com

Respondent
Phone: 704-998-4050

**Party Represented:**
TitleMax of South Carolina, Inc.

## Will Farley

Troutman Pepper Hamilton Sanders, LLP

Will Farley
301 S. College St.
34th Floor
Charlotte, NC 28202
will.farley@troutman.com

Respondent
Phone: 704-998-4050

**Party Represented:**
TitleMax of South Carolina, Inc.

## Jed Komisin

Troutman Pepper Hamilton Sanders, LLP

Jed Komisin
301 S. College St.
34th Floor
Charlotte, NC 28202
jed.komisin@troutman.com

Respondent
Phone: 704-998-4050

**Party Represented:**
TitleMax of South Carolina, Inc.

## Brian Nichilo

Troutman Pepper Hamilton Sanders, LLP

Brian Nichilo
301 S. College St.
34th Floor
Charlotte, NC 28202
brian.nichilo@troutman.com

Respondent
Phone: 704-998-4050

**Party Represented:**
TitleMax of South Carolina, Inc.

*4/26/2021*

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Kimble, Rayford vs. TitleMax of South Carolina, Inc.
Reference No. 1440007063

I, Nykesha Potts, not a party to the within action, hereby declare that on April 26, 2021, I served the

attached Interim Award - Order No. 3 on the parties in the within action by Email and by depositing true copies

thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Atlanta,

GEORGIA, addressed as follows:

Drew Brown Esq.
Brown, Faucher, Peraldo, et al.
822 N Elm St
Suite 200
Greensboro, NC 27401
Phone: 336-478-6000
drew@greensborolawcenter.com
    Parties Represented:
    Rayford Kimble

Jason D. Evans Esq.
Ben Bollinger Esq,
Will Farley Esq.
Troutman Pepper Hamilton Sanders, LLP
301 S. College St.
34th Floor
Charlotte, NC 28202
Phone: 704-998-4050
Jason.Evans@troutman.com
ben.bollinger@troutman.com
will.farley@troutman.com
    Parties Represented:
    TitleMax of South Carolina, Inc.

Jed Komisin Esq.
Brian Nichilo Esq.
Troutman Pepper Hamilton Sanders, LLP
301 S. College St.
34th Floor
Charlotte, NC 28202
Phone: 704-998-4050
jed.komisin@troutman.com
brian.nichilo@troutman.com
    Parties Represented:
    TitleMax of South Carolina, Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Atlanta, GEORGIA on April 26, 2021.

Nykesha Potts
nykeshapotts@jamsadr.com